UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| AMANDA B. B., | ) | NO. ED CV 19-1844-E |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| ANDREW SAUL, Commissioner of | ) | **AND ORDER OF REMAND** |
| Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

Pursuant to sentence four of 42 U.S.C. section 405(g), IT IS HEREBY ORDERED that Plaintiff's and Defendant's motions for summary judgment are denied, and this matter is remanded for further administrative action consistent with this Opinion.

## PROCEEDINGS

Plaintiff filed a complaint on September 25, 2019, seeking review of the Commissioner's denial of benefits. The parties consented to proceed before a United States Magistrate Judge on November 11, 2019. Plaintiff filed a motion for summary judgment on

February 18, 2020.  Defendant filed a motion for summary judgment on
March 17, 2020.  The Court has taken the motions under submission
without oral argument.  <u>See</u> L.R. 7-15; "Order," filed October 2,
2019.

**BACKGROUND**

Plaintiff asserts disability since December 5, 2013, based on
numerous alleged physical and mental impairments (Administrative
Record ("A.R.") 212, 232, 238, 273, 285, 287).  An Administrative Law
Judge ("ALJ") reviewed the record and heard testimony from a
vocational expert and from Plaintiff, who appeared at the hearing
without representation (A.R. 21-30, 36-57).

Of Plaintiff's numerous alleged impairments, the ALJ found
severe only Plaintiff's fibromyalgia and anxiety disorder (A.R. 23).
The ALJ stated that Plaintiff retains a residual functional capacity
for sedentary work, limited to: (1) routine, repetitive tasks with no
contact with the public and only occasional teamwork (more than five
people); and (2) no being off task for more than five percent of the
time, no being absent from work more than two times a month,[1] no
hypervigilance, no quick decision making, no rapid physical
activities, and no complex tasks (A.R. 25-29 ("lowering" Plaintiff's
residual functional capacity from that assessed by state agency
physicians assertedly "to reflect the limitations of [Plaintiff's]

---

[1]      The ALJ's decision states that Plaintiff would miss
work "one to time [sic] times a month" (A.R. 25).  The Court has
interpreted this statement as meaning "one to <u>two</u> times a month."

fibromyalgia," and rejecting Plaintiff's subjective complaints
claiming greater limits)).  The ALJ determined that, with this
capacity, Plaintiff could perform jobs existing in significant
numbers in the national economy (A.R. 29-30 (adopting vocational
expert testimony at A.R. 53-56)).  The Appeals Council denied review
(A.R. 1-3).

**STANDARD OF REVIEW**

Under 42 U.S.C. section 405(g), this Court reviews the
Administration's decision to determine if: (1) the Administration's
findings are supported by substantial evidence; and (2) the
Administration used correct legal standards.  See Carmickle v.
Commissioner, 533 F.3d 1155, 1159 (9th Cir. 2008); Hoopai v. Astrue,
499 F.3d 1071, 1074 (9th Cir. 2007); see also Brewes v. Commissioner,
682 F.3d 1157, 1161 (9th Cir. 2012).  Substantial evidence is "such
relevant evidence as a reasonable mind might accept as adequate to
support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401
(1971) (citation and quotations omitted); see also Widmark v.
Barnhart, 454 F.3d 1063, 1066 (9th Cir. 2006).

> If the evidence can support either outcome, the court may
> not substitute its judgment for that of the ALJ.  But the
> Commissioner's decision cannot be affirmed simply by
> isolating a specific quantum of supporting evidence.
> Rather, a court must consider the record as a whole,
> weighing both evidence that supports and evidence that
> detracts from the [administrative] conclusion.

Tackett v. Apfel, 180 F.3d 1094, 1098 (9th Cir. 1999) (citations and quotations omitted).

**DISCUSSION**

After consideration of the record as a whole, the Court reverses the Administration's decision in part and remands the matter for further administrative proceedings.  As discussed below, the Administration materially erred in evaluating the evidence of record.

**I.    Summary of the Relevant Medical Evidence**

**A.    Treatment Records**

The Administrative Record contains periodic treatment notes from the Akmakjian Spine and General Orthopaedics Center during October, 2011 - December, 2016 (A.R. 394-95, 477-500, 550-57).  The record also contains periodic treatment notes from primary care physician Dr. Arthur Jimenez during August, 2014 - December, 2016 (A.R. 385-89, 541-44).  Both sets of notes are difficult to decipher.

Plaintiff first presented to Dr. Akmakjian in October of 2011, complaining of, inter alia, back pain, headaches, joint pain in her knees, shoulders and hands and numbness/weakness in her back and hands (A.R. 499).  On examination, Plaintiff had a positive straight leg raising test (A.R. 498).  She was diagnosed with a herniated nucleus pulposis at L5-S1, lumbar degenerative disc disease, low back pain and sciatica (based in part on an October, 2011 MRI) (A.R. 498).

She was prescribed Norco and three lumbar epidural steroid injections (A.R. 498).

In January of 2012, Plaintiff complained of increasing low back pain and left lower extremity radiculitis (A.R. 497). On examination, she had positive straight leg raising, positive Lasegue's test, and spasm (A.R. 497). She reportedly was also having headaches (A.R. 497). She was diagnosed with left lower extremity radiculitis, and her Norco was continued (A.R. 497). She then was awaiting approval for a lumbar epidural steroid injection (A.R. 497).

In February, June and December of 2012, Plaintiff continued to report pain (A.R. 494-96). By June, she was attending physical therapy and had undergone two lumbar spine epidural injections, which reportedly provided only some relief (A.R. 495). On examination, Plaintiff had tenderness to palpation along the lumbar spine with radiculopathy in the left leg, positive left straight leg raising, and positive left Lasegue's test (A.R. 495). Her physical therapy and medications were continued (A.R. 495). In December, an updated MRI was ordered due to Plaintiff's worsening symptoms, and she was given a TENS unit (A.R. 495).

In January of 2013, Plaintiff complained of worsening right hip pain and groin pain (A.R. 493). Pelvis and bilateral hip x-rays were ordered (A.R. 493). In July of 2013, Plaintiff complained of worsening low back pain, and she reported that her lumbar epidural injections had not helped (A.R. 492). She was prescribed a lumbar facet block injection, and her Norco was continued (A.R. 492).

In September of 2013, Plaintiff reported persistent low back pain (A.R. 491). Examination results were largely unchanged from prior examinations (A.R. 491). She was diagnosed with lumbar facet arthritis, her medications were continued, and her doctor scheduled an MRI and a facet block injection (A.R. 491).

In February of 2014, Plaintiff reported that her pain was persisting (A.R. 490). Knee and cervical spine x-rays were normal (A.R. 396-98).[2]

In January of 2015, Plaintiff complained of low back pain, knee pain and chronic headaches, and she was diagnosed with patella tedonitis (A.R. 489). A treatment record from February of 2015

---

[2] Plaintiff underwent a physical examination with Dr. Jimenez in August of 2014, at which time she was diagnosed with osteoarthritis in her knees, joint pain, anxiety, cervical degenerative disc disease, a mood disorder and opioid and sedative dependence (A.R. 389). In October of 2014, Plaintiff reported headaches every day, with neck problems, severe bilateral knee pain and increased anxiety for which she was prescribed Xanax and Norco and referred to a pain clinic (A.R. 388).

An orthopedist with the Southern California Bone & Joint Clinic evaluated Plaintiff's knees in November of 2014 (A.R. 390-93). Plaintiff reported having constant bilateral knee pain (left greater than right) for the past five years, arthralgias, joint and back pain, frequent, severe headaches, anxiety and sleep disturbance (A.R. 391). She reportedly had swelling in her left knee, with grinding and radiation down the leg (A.R. 391). On examination, her right leg was shorter than her left leg, and she had positive patellofemoral compression, pain with motion under the patella on the right, bilateral tenderness of the patellar tendon and crepitus (A.R. 392). She was diagnosed with knee pain, chondromalacia of the patella and patellar tendonitis (A.R. 392-93). She was referred for physical therapy, and her Norco was continued (id.).

noted possible bilateral carpal tunnel syndrome and ordered bilateral knee MRIs (A.R. 488). In April of 2015, Plaintiff was diagnosed with chronic myofascial pain (A.R. 487).

In June of 2015, Plaintiff complained of daily headaches, as well as pain in her neck, low back and knees (A.R. 486). A lumbar spine MRI reflected degenerative changes, particularly at L4-L5 and L5-S1 (A.R. 402-03). The MRI showed: (1) a three millimeter disc protrusion at L4-L5 with annular fissure, mild facet arthropathy, no significant central canal narrowing and mild foraminal narrowing; (2) a 3-4 millimeter disc protrusion at L5-S1 with a small annual fissure, mild facet arthropathy, mild to moderate narrowing of the left lateral recess, mild foraminal narrowing on the left and no significant narrowing on the right; and (3) a 2-3 millimeter diffuse disc bulge at T11-T12 without significant stenosis (A.R. 402-03). A right knee MRI reported only trace joint effusion (A.R. 404). Plaintiff's doctor requested approval for cervical facet blocks (A.R. 486). When Plaintiff returned in August, Plaintiff reported that her migraines were increasing (A.R. 485). Her doctor added lidocaine patches (A.R. 485).[3]

In October of 2015, Plaintiff reported increased pain in her neck after having been in a motor vehicle accident earlier that month

_____

[3] Plaintiff underwent another physical examination with Dr. Jimenez in August of 2015, at which time Plaintiff was diagnosed with chronic pain syndrome, lumbar and cervical degenerative disc disease, lumbago, sacroiliitis, anxiety, sedative dependence and osteoarthritis in her knees (A.R. 385-86).

(A.R. 484).  The treatment record stated "possible MS - will see neurologist" (A.R. 484).[4]  In November, she reported worsening pain (A.R. 483).  A November, 2015 cervical spine MRI reflected degenerative disc disease at several levels, most prominent at C6-C7, which showed a 2-3 millimeter disc protrusion, mild central canal stenosis and minimal bilateral foraminal narrowing (A.R. 400-01).  There were no significant interval changes from the May, 2015 study (A.R. 401; see also A.R. 406-07 (earlier study)).

In February of 2016, she reported that she had received two weeks of chiropractic treatment and was "seeing significant benefit"

---

[4]   Plaintiff had gone to the Desert Valley Hospital emergency room in September of 2015, complaining of dizziness, nausea, vomiting, abdominal pain and increasing headaches, and she then said that her vertigo medications were not working (A.R. 315).  Plaintiff reported that she had 2-3 years of intermittent neurological symptoms, including paresthesias in various parts of her body and occasional visual changes, and she was concerned she might have multiple sclerosis (A.R. 315).  A brain CT scan was normal (A.R. 322).  Plaintiff was dehydrated and dizzy, and she was ordered to follow up with a neurologist (A.R. 317-18).

She returned to the emergency room in October, after having been in the accident, complaining of neck pain/stiffness and headache (A.R. 334).  Plaintiff reportedly had a history of bulging C6-C7 and lumbar spine discs from a car accident when she was young for which she was taking Norco three times a day (A.R. 334-35).  On examination, Plaintiff appeared drowsy from her medications and she exhibited pain on both sides of her shoulders consistent with cervical radiculopathy from her prior injury (A.R. 335).  Cervical spine x-rays showed straightening of the normal cervical lordosis and mild spondylosis of the C5-C6 and C6-C7 levels with no acute findings (A.R. 337).  She was diagnosed with a cervical spine strain and noted to have cervical radiculopathy due to osteoarthritis (A.R. 337, 472).  She was advised to continue taking Norco and to follow up with her regular doctor for a possible physical therapy referral (A.R. 337).  In February of 2016, Plaintiff was given a Toradol injection and referred to her regular doctor (A.R. 341).

(A.R. 482).[5]  Consistent with prior examinations, Plaintiff's examination results showed spasm, painful/decreased range of motion, facet tenderness, positive Lasegue's test, positive straight leg raising and possible Raynaud's syndrome (A.R. 482).  She was referred for a rheumatology evaluation (A.R. 482).

In March of 2016, Plaintiff complained of neck pain and right hand numbness (A.R. 481).  She was taking Norco and using a lidocaine patch (A.R. 481).

In May of 2016, Plaintiff complained of neck and low back pain and said she was still awaiting consultations by a neurologist and a rheumatologist (A.R. 480).[6]  In July of 2016, Plaintiff complained of low back pain and right hand numbness, and she said that her neck and back "flare up" very easily (A.R. 479).  Her chiropractic treatment reportedly was helping (A.R. 479).  Her medications were continued (A.R. 479).

///

---

[5]     Treatment notes from Chiropractor Brad Hannon are dated from February of 2016 through June of 2016 (A.R. 420-61). Plaintiff reported improvement, but with some "acute flare-ups" (A.R. 422, 424, 426, 428, 430, 432, 434, 436, 438, 440, 442, 444, 446, 448, 450, 452, 454, 456-58, 460).

[6]     Plaintiff underwent another physical examination with Dr. Jimenez in June of 2016, at which time she exhibited decreased range of motion in her neck (A.R. 543-44).  Dr. Jimenez referred Plaintiff for neurology, pain management, psychiatry and rheumatology evaluations (A.R. 543).  Plaintiff returned in December of 2016, requesting a referral for pain management, neurology and for a second rheumatology opinion (A.R. 541). Although Plaintiff requested a referral for a second rheumatology opinion, there are no rheumatology opinions in the record.

In August of 2016, Plaintiff reported that she had been diagnosed with fibromyalgia by the neurologist, but the report was then unavailable (A.R. 553).[7] Plaintiff was referred for another EMG study, MRI and pain management, with a note that she may need peripheral nerve surgery for carpal tunnel release (A.R. 553).[8]

In October of 2016, Plaintiff reported that a brain MRI was negative (A.R. 552). Plaintiff was directed to follow up with a neurologist for her headaches, right carpal tunnel syndrome and cervical radiculopathy (A.R. 552). She declined another pain injection at that time (A.R. 552).

///

///

---

[7] Neurologist Dr. Raj Karnani evaluated Plaintiff in July of 2016 (A.R. 505-09). Plaintiff complained of diffuse body aches, pain in her back and neck, numbness and weakness in the extremities, hip pain, headaches/chronic migraines, anxiety, depression and random chill spots on her body, and she reportedly displayed "diffuse truncal and extremity tenderness" (A.R. 505, 508). EMG and nerve conduction studies were abnormal, revealing evidence of right carpal tunnel syndrome and C5-C6 radiculopathy on the right side for which clinical correlation was recommended (A.R. 505-07). Plaintiff reported that she had been seeing an orthopedic doctor for six years and he/she could not figure out what was wrong with her, but Plaintiff suspected multiple sclerosis or fibromyalgia (A.R. 508 (emphasis added)). On examination, Plaintiff reportedly had reduced pinprick sensations and reduced proprioception in her lower extremities, but no other abnormal findings (A.R. 508). Dr. Karnani diagnosed cervical and lumbar radiculopathy, hereditary and idiopathic neuropathy (unspecified), and bilateral carpal tunnel syndrome (A.R. 509). Dr. Karnani also noted, "Patient likely has fibromyalgia as well" (A.R. 505 (emphasis added)). He referred Plaintiff to rheumatology for evaluation and for pain management (A.R. 505).

[8] A September, 2016 brain MRI showed a partial "empty sella" of unknown clinical significance but no intracranial mass, hemorrhage or hydrocephalus (A.R. 528).

In November of 2016, Plaintiff reportedly was still awaiting a pain management evaluation (A.R. 551). In December of 2016, Plaintiff returned after having gone to the hospital for hip pain (A.R. 550). Again, the record indicated that she might need carpal tunnel release (A.R. 550).

**B.    Medical Source Opinions**

Psychologist Dr. Rashin D'Angelo prepared a Mental Evaluation by Psychologist, dated October 14, 2016 (A.R. 532-36). Before preparing this evaluation, Dr. D'Angelo did not review any of Plaintiff's medical records (A.R. 532). Plaintiff reportedly complained to Dr. D'Angelo of anxiety, pain, arthritis, degenerative disc disease, empty sella syndrome, fibromyalgia, panic attacks, paranoia, fear, erratic sleep and feeling overwhelmed (A.R. 532-33). After a mental status examination, Dr. D'Angelo diagnosed anxiety disorder (not otherwise specified) and assigned a Global Assessment of Functioning score of 70 (A.R. 535).

Dr. D'Angelo opined that Plaintiff has only mild difficulties in maintaining social functioning and no difficulties in focusing and maintaining attention, concentration, persistence and pace (A.R. 535). Dr. D'Angelo opined that Plaintiff would have no mental limitations performing simple and repetitive tasks, performing detailed and complex tasks or performing work activities on a consistent basis without special or additional supervision (A.R. 535). Dr. D'Angelo further opined that Plaintiff would have only mild limitations completing a normal workday or work week "due to her

physical issues,"[9] mild limitations accepting instructions from
supervisors and interacting with coworkers and with the public, and
mild difficulties handling the usual stress, changes and demands of
gainful employment (A.R. 535). Dr. D'Angelo gave Plaintiff a good
prognosis, opining that Plaintiff's condition would significantly
improve with treatment to improve her coping and stress management
skills (A.R. 535-36).

State agency physicians Dr. Julie Chu and Dr. Alan Berkowitz
reviewed the record as of late 2016 and found "there [was]
insufficient evidence to adjudicate the severity of all of
[Plaintiff's] physical allegations" from her alleged onset date to
her date last insured of June 30, 2015, for her Title II claim. See
A.R. 65-66; see also A.R. 21 (noting that Plaintiff had applied for
both supplemental security income and disability insurance benefits).
The Findings of Fact and Analysis of Evidence section of the state
agency physicians' report described the records from Drs. Jimenez and
Akmakjian as "illegible" (A.R. 65-66). This section of the report
also noted that there was "scant documentation" of musculoskeletal
examinations with ranges of motions, neurological examinations, or
gait descriptions (A.R. 65-66). Dr. Karnani's neurological
evaluation evidently was not in the record reviewed by the state
agency physicians, and it appears that the record also did not then
include Plaintiff's MRI studies (because none are mentioned in the
Findings of Fact and Analysis of Evidence) (A.R. 61-66, 77-82). The

_____

[9]     Dr. D'Angelo, a psychologist who reviewed none of
Plaintff's medical records, did not indicate what "physical
issues" Dr. D'Angelo may have had in mind.

state agency physicians believed that a consultative examination would be needed to evaluate the severity of Plaintiff's impairments (A.R. 64).

Based on the limited evidence reviewed, Dr. Chu found Plaintiff's medically determinable impairments of degenerative disc disease and "spine disorders" "severe," but found no other physical medically determinable impairments (A.R. 68). Dr. Chu opined that Plaintiff was capable of performing medium work with certain postural and environmental limitations (for Plaintiff's Title XVI claim only) (A.R. 66, 68, 70-72). Dr. Berkowitz found Plaintiff's anxiety disorder non-severe (A.R. 66, 68, 70).

On reconsideration, state agency physician Dr. E. Steinsapir and state agency psychologist Dr. M. Bongiovani reviewed the updated record in February of 2017, which included Dr. Karnani's records and updated records from Drs. Jimenez and Akmakjian (A.R. 94-98, 99). Dr. Jimenez's records were described as "hard to decipher," and Dr. Akmakjian's records were described as mostly "illegible" (A.R. 99). Dr. Bongiovani affirmed the previous non-severity finding for Plaintiff's anxiety disorder (A.R. 99, 100-02). Dr. Steinsapir believed that Plaintiff's medically determinable "spine disorders" were "severe," but stated that Plaintiff's medically determinable impairments of fibromyalgia, carpal tunnel syndrome, anxiety disorders, and substance addition disorders were all assertedly "non severe" (A.R. 101). Dr. Steinsapir adopted the same residual functional capacity that Dr. Chu had offered on initial review (A.R. 104-05).

**II.  The ALJ Materially Erred in Evaluating the Medical Evidence.**

As indicated above, the ALJ reviewed the medical record and found that Plaintiff has severe fibromyalgia and anxiety disorder (A.R. 23, 27).  In so finding, and in assessing Plaintiff's residual functional capacity, the ALJ reportedly gave "little weight" to the opinions of the state agency physicians (A.R. 27).  Yet, the opinions of the state agency physicians were the <u>only</u> arguably competent medical opinions in the record regarding Plaintiff's physical residual functional capacity.[10]  The ALJ did not order a consultative examination related to Plaintiff's physical condition (an examination the state agency physicians believed was necessary).  The ALJ did not develop the record further despite the state agency physicians' observations that much of the medical record reviewed was illegible or difficult to decipher.  Rather, unaided by expert medical opinion or a fully legible medical record, the ALJ proceeded to assess a residual functional capacity the ALJ purportedly believed would "reflect the limitations of [Plaintiff's] [severe] fibromyalgia" (A.R. 23, 27).  In so doing, the ALJ appears necessarily to have relied on his own non-medical lay opinion of Plaintiff's fibromyalgia and resulting limitations.

An ALJ cannot properly rely on the ALJ's own lay knowledge to make medical interpretations of examination results or to determine

---

[10]     The Court does not regard the consultative psychologist's reference to unspecified "physical issues" as a an arguably competent medical opinion regarding Plaintiff's physical residual functional capacity.  <u>See</u> footnote 9 <u>supra</u>.

the severity of medically determinable impairments.  See Tackett v.
Apfel, 180 F.3d 1094, 1102-03 (9th Cir. 1999); Balsamo v. Chater, 142
F.3d 75, 81 (2d Cir. 1998); see also Rohan v. Chater, 98 F.3d 966,
970 (7th Cir. 1996) ("ALJs must not succumb to the temptation to play
doctor and make their own independent medical findings"); Day v.
Weinberger, 522 F.2d 1154, 1156 (9th Cir. 1975) (an ALJ is forbidden
from making his or her own medical assessment beyond that
demonstrated by the record).  Particularly given the partial
illegibility of the medical record, the ALJ could not competently
translate the medical evidence into a residual functional capacity
assessment, absent expert medical assistance.  See Tackett v. Apfel,
180 F.3d at 1102-03 (ALJ's residual functional capacity assessment
cannot stand in the absence of evidentiary support).

Instead of making his own lay assessment of Plaintiff's physical
limitations, the ALJ should have ordered an examination and
evaluation of Plaintiff by a consultative specialist and should have
developed the record further to address the problem of the illegible
treatment notes.  See Day v. Weinberger, 522 F.2d at 1156; see also
Reed v. Massanari, 270 F.3d 838, 843 (9th Cir. 2001) (where available
medical evidence is insufficient to determine the severity of the
claimant's impairment, the ALJ should order a consultative
examination by a specialist); accord Kish v. Colvin, 552 Fed. App'x
650 (2014); see generally McLeod v. Astrue, 640 F.3d 881, 885 (9th
Cir. 2011) (ALJ must develop record when there is ambiguous evidence
or when the record is inadequate to allow for proper evaluation of
the evidence; ALJ must be "especially diligent" when the claimant is
unrepresented) (citations omitted); Mayes v. Massanari, 276 F.3d 453,

459-60 (9th Cir. 2001) (same); <u>Brissett v. Heckler</u>, 730 F.2d 548, 550
(8th Cir. 1984) (remand warranted where material portions of the
record were illegible); <u>Brown v. Heckler</u>, 713 F.2d 441, 443 (9th Cir.
1983) ("[T]he ALJ has a special duty to fully and fairly develop the
record to assure the claimant's interests are considered.  This duty
exists even when the claimant is represented by counsel.").

On the current record, the Court is unable to deem the ALJ's
errors to have been harmless.  <u>See</u> <u>Treichler v. Commissioner</u>, 775
F.3d 1090, 1105 (9th Cir. 2014) ("Where, as in this case, an ALJ
makes a legal error, but the record is uncertain and ambiguous, the
proper approach is to remand the case to the agency"); <u>see also</u>
<u>Molina v. Astrue</u>, 674 F.3d 1104, 1115 (9th Cir. 2012) (an error "is
harmless where it is inconsequential to the ultimate non-disability
determination") (citations and quotations omitted); <u>McLeod v. Astrue</u>,
640 F.3d at 887 (error not harmless where "the reviewing court can
determine from the 'circumstances of the case' that further
administrative review is needed to determine whether there was
prejudice from the error").

**III.  <u>Remand for Further Administrative Proceedings is Appropriate.</u>**

Remand is appropriate because the circumstances of this case
suggest that further development of the record and further
administrative review could remedy the ALJ's errors.  <u>See</u> <u>McLeod v.</u>
<u>Astrue</u>, 640 F.3d at 888; <u>see also</u> <u>INS v. Ventura</u>, 537 U.S. 12, 16
(2002) (upon reversal of an administrative determination, the proper
course is remand for additional agency investigation or explanation,

except in rare circumstances); <u>Leon v. Berryhill</u>, 880 F.3d 1041, 1044
(9th Cir. 2017) (reversal with a directive for the immediate
calculation of benefits is a "rare and prophylactic exception to the
well-established ordinary remand rule"); <u>Dominguez v. Colvin</u>, 808
F.3d 403, 407 (9th Cir. 2015) ("Unless the district court concludes
that further administrative proceedings would serve no useful
purpose, it may not remand with a direction to provide benefits");
<u>Treichler v. Commissioner</u>, 775 F.3d at 1101 n.5 (remand for further
administrative proceedings is the proper remedy "in all but the
rarest cases"); <u>Harman v. Apfel</u>, 211 F.3d 1172, 1180-81 (9th Cir.),
<u>cert. denied</u>, 531 U.S. 1038 (2000) (remand for further proceedings
rather than for the immediate payment of benefits is appropriate
where there are "sufficient unanswered questions in the record").
There remain significant unanswered questions in the present record.
///
///
///
///
///
///
///
///
///
///
///
///
///
///

**CONCLUSION**

For all of the foregoing reasons,[11] Plaintiff's and Defendant's motions for summary judgment are denied and this matter is remanded for further administrative action consistent with this Opinion.

LET JUDGMENT BE ENTERED ACCORDINGLY.

DATED: April 2, 2020.

_____/s/_____
CHARLES F. EICK
UNITED STATES MAGISTRATE JUDGE

---

[11]    The Court has not reached any other issue raised by Plaintiff except insofar as to determine that reversal with a directive for the immediate payment of benefits would not be appropriate at this time.